J-S04004-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| D.S. | : | |
| Appellant | : | No. 1769 EDA 2025 |

Appeal from the Judgment of Sentence Entered April 28, 2025
In the Court of Common Pleas of Montgomery County Criminal Division at
No(s):  CP-46-CR-0004376-2023

BEFORE:  LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY LAZARUS, P.J.:                 **FILED MARCH 13, 2026**

D.S. appeals from the judgment of sentence,[1] entered in the Court of Common Pleas of Montgomery County, following his conviction of one count each of indecent assault of a minor[2] and endangering the welfare of a child (EWOC).[3]  After careful review, we affirm.

D.S. is the paternal granduncle of M.V., the victim in this case, who was nine years old at the time of the offenses.  **See** N.T. Jury Trial, 11/12/24, at

---

[1] In his notice of appeal, D.S. purports to appeal from the denial of his post-sentence motion.  However, "[i]n a criminal action, [an] appeal properly lies from the judgment of sentence[.]"  **Commonwealth v. Shamberger**, 788 A.2d 408, 410 n.2 (Pa. Super. 2011) (en banc) (citation omitted).  We have amended the caption accordingly.

[2] 18 Pa.C.S.A. § 3126(a)(7).

[3] **Id.** at § 4304.

31-32. The victim is one of three children; M.V. has an older brother, J.V., who was twelve years old at the time, and a younger brother who was eight years old (collectively, Children).[4] *See id.* at 31. Children live in Gladwyne, Montgomery County with their parents M.V. (Mother) and W.V. (Father) (collectively "Parents"). *See id.* at 30-31. D.S., who lived by himself, also lived in Gladwyne, around the block from Parents' home. *See id.* at 32. Parents occasionally invited D.S. over for family dinners and holidays. *See id.* at 32. Mother testified that sometimes the family would see him "a couple times a month, or [they] would go a few months without actually seeing him," though D.S. testified that he had only been to their house "less than a handful" of times. *See id.* at 33-34; *id.*, 11/13/24, at 57. The Mother described D.S. as "part of our family." *See id.*, 11/12/24, at 33.

In May 2019,[5] Parents, Children's two maternal and paternal grandmothers, Children, and D.S. all drove together from Gladwyne to Philadelphia for a family dinner at a restaurant. *See id.* at 71-72. On the drive home, M.V. sat in the third row of the family's car on D.S.'s lap facing

---

[4] The younger brother's initials are also J.V. However, because he did not testify at trial or play a significant role in the case, and to avoid confusion, we refer to him as the younger brother.

[5] Both M.V. and D.S. stated at trial that the incident occurred in May 2019. *See id.* at 71; *id.*, 11/13/24, at 64. Mother expressed less certainty, testifying that it could have been anywhere from 2019-2022, and J.V. estimated it took place in 2017. *See id.*, 11/12/24, at 65-66, 115. For the purposes of this opinion, the incident date is May 2019.

forward, with her back on his chest.[6] **_See id._**, 11/12/24, at 76-77. At some point during the ride, D.S. put both his hands up M.V.'s shirt and began moving them "back and forth" on her chest. **_See id._** at 77-78. D.S. then put his hands in the victim's shorts, under her underwear, and began touching her vagina. **_See id._** at 79. M.V. described hearing "heavy breathing" coming from D.S. during the assault. **_See id._** She testified that D.S. stopped the behavior five to ten minutes before he was dropped off at his house. **_See id._** at 77-78. M.V. further testified she did not tell anyone about this immediately after it happened because she was "confused" and "scared." **_See id._** at 81.

J.V. testified consistently with M.V. but stated that he never saw D.S.'s hands go under M.V.'s clothes. Instead, J.V. testified that he saw D.S. "moving [M.V.] up and down," and "forward and back on his lap," with his hands on her waist, near his groin area. **_See id._** at 110. J.V. also stated that D.S. was breathing "really, really loudly" and "the longer he was moving [M.V.] on his lap, the louder[,] . . . weirder[,] and crazier his breaths became." **_See id._** at 111. When asked if he saw D.S. touch any other part of the victim's body, J.V. stated D.S. touched the victim's back. **_See id._** J.V. also testified that he did not say anything to anyone at first because he was scared. **_See id._** at 112.

---

[6] The SUV had three rows of seats and seven seats total. Father was driving, Mother was the passenger, and Children's grandmothers were in the two middle seats. D.S. and Children were in the back row, which had only three seats. In particular, M.V. was seated on D.S.'s lap in the left seat, the younger brother was in the middle seat, and J.V. was in the right seat.

D.S. testified in his own defense and described a very similar version of events, minus the inappropriate touching. Specifically, D.S. corroborated the testimony about where everyone was sitting, including that M.V. was sitting on his lap during the ride home. *See id.*, 11/13/24, at 58. However, D.S. claimed he only rubbed the victim's back in a "fatherly affection[ate]" way. *See id*. D.S. also testified that he was unable to achieve an erection in 2019, referring to himself as "a sexually dead man." *See id.* at 60.

For four years, the incident went unreported. However, Mother testified that, around spring of 2023, "all of a sudden" M.V. started acting out, talking back to her and Father, and missing school assignments. *See id.*, 11/12/2024, at 35-36. Additionally, Mother observed M.V. shy away from physical contact and affection. *See id.* at 36. These behaviors led Mother to become suspicious of M.V., so she started checking her phone. *See id.* at 37. Eventually, Mother came across a text from M.V. to her then-boyfriend, that said:

> Well, I don't know how to say this, so I'mma flat out just say it: It was my uncle that raped me. So[,] when someone puts their arm around me, it makes me really uncomfortable because he did that to me, and then he raped me. So, yeah, don't tell anyone, please.

*Id.* at 40. M.V. also texted her boyfriend that D.S. raped her twice, once when she was nine and again when she was ten. *See id.* at 41. At trial, however, M.V. admitted that this was not true; there was only one incident, and that it was the May 2019 molestation, not rape. *See id.* at 84-88.

After discovering the text message, Mother looked through old photographs to see when the incident could have taken place. *See id.* at 42. She found a photograph from Mother's Day 2019 that included all eight family members. *See id.* at 45. Mother also asked J.V. about the text message and stated that when she mentioned it, "[h]is face just completely changed" and that then she "knew it was real." *See id.* at 43-44. Father confronted D.S. about the incident and informed him that he was cutting off their relationship. *See id.* at 125-26.

As a result of the foregoing, M.V. completed an interview with Mission Kids Child Advocacy Center (Mission Kids),[7] a video of which was played for the jury at trial. *See id.*, 11/13/24, at 10. The police investigated the incident and, ultimately, filed the above-mentioned charges against D.S.

On November 12-13, 2024, D.S. proceeded to a jury trial. At the conclusion of trial, the jury convicted D.S. of the charges. The trial court deferred sentencing and ordered the preparation of a pre-sentence investigation report.

On April 28, 2025, the trial court sentenced D.S. to an aggregate term of five months' to twenty-three months' incarceration, as well as a consecutive term of five years' probation. On May 7, 2025, D.S. filed a timely post-sentence motion, which the trial court denied.

---

[7] The forensic interviewer from Mission Kids, Pamela Alvarado, testified on Day 2 of the jury trial. *See id.*, 11/13/24 at 4. Her interview with M.V. was admitted into evidence as Commonwealth Exhibit 4 (C-4). *See id.* at 10-13.

D.S. filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. D.S. now raises the following claims for our review:

(1) Whether the trial court erred when it denied [D.S.]'s post-sentence motion in arrest of judgment?

(2) Whether the trial court erred when it denied [D.S.]'s post-sentence motion for judgment of acquittal based on insufficient evidence?

(3) Whether the trial court erred when it denied [D.S.]'s post-sentence motion for new trial because the verdict was against the weight of the evidence?

Appellant's Brief, at 3-4.

D.S.'s first issue on appeal asserts that the trial court erred by denying his motion to arrest judgment because the Commonwealth failed to include the correct incident date in its amended criminal information. *See* Appellant's Brief, at 6-7. D.S. argues that the amended criminal information was defective because it alleged that the incident occurred in May 2021, while the evidence produced at trial established that the incident actually occurred two years before, in May 2019. *See* Appellant's Brief, at 8. D.S. contends the defect in the amended information did not give him sufficient notice of the crime he was being tried for and, thus, interfered with his constitutional due process rights. *See id.* at 10. We disagree.

As an initial matter, the Commonwealth argues that this claim is waived because, although D.S. frames the issue as a challenge to the denial of his request for arrest of judgment, his argument is exclusively about a defect in

the criminal information. *See* Appellee's Brief, at 9 n.1. Generally, a motion to quash an information must be made in an omnibus pre-trial motion, and failure to do so results in waiver of a later request to quash. *See* Pa.R.Crim.P. 578; *see also Commonwealth v. Aguilar*, 340 A.3d 311, 320 (Pa. Super. 2025) ("A motion to quash is an appropriate means for raising defects apparent on the face of the information [.]").

Here, we conclude that D.S. waived his claim to arrest judgment based on the defect in the criminal information. We observe that the Commonwealth filed the original criminal information on October 26, 2023, which alleged that the incident occurred "on or about Saturday, the 8th day of May, 2021[.]" Criminal Information, 10/26/23*.* On November 12, 2024, the Commonwealth filed the amended criminal information, which changed the grade of all third-degree felonies filed against D.S. to first-degree misdemeanors. However, the Commonwealth did not change the incident date despite possessing information that it took place on Mother's Day of May 2019. *See* Affidavit of Probable Cause, at 2 ("On May 9, 2023 . . . a juvenile female . . . alleges that a family member . . . touched her four years ago [i.e., in 2019].").

Before his preliminary hearing, D.S. received the Affidavit of Probable Cause which alleged that the incident occurred in May 2019. *See id.* Additionally, after his preliminary hearing, D.S. then received the defective criminal information, which had the date of the incident as May 2021. It is at this time, post-preliminary hearing and pre-trial, that D.S. should have filed a

Pa.R.Crim.P. 578 omnibus motion to quash or dismiss the criminal information for patent defect. ***See*** Pa.R.Crim.P. 578 ("all pretrial requests for relief **shall** be included in one omnibus motion") (emphasis added); ***see also id.*** Cmt. ("Types of relief appropriate for the omnibus pretrial motions include . . . (5) to quash or dismiss an information"). Furthermore, even if D.S. could not have known the defective date based upon the difference in dates contained in the Affidavit of Probable Cause and Criminal Information, he knew or should have known that the date in the Criminal Information was defective at trial when both he and M.V. testified that the incident occurred in May of 2019. ***See*** N.T. Jury Trial, 11/12/24, at 84; ***id.***, 11/13/24, at 64. However, D.S. did not raise an objection at trial. Consequently, D.S.'s failure to file a Rule 578 pre-trial motion, or to even object to the date of incident at trial,[8] waives his claim for the purposes of appeal. ***See*** Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for first time on appeal."); ***Commonwealth v. Veneri***, 452 A.2d 784, 788 (Pa. Super. 1982) (finding

---

[8] As noted, D.S., himself, testified during trial that the date of the incident was May 2019. ***See id.***, 11/13/24, at 64 ("I believe it was 2019, according to [the victim]."). Thus, notwithstanding waiver of the issue, D.S.'s argument fails on the merits as well, since there is no evidence that he was "misled" as to the charges against him. ***See Commonwealth v. Morales***, 669 A.2d 1003, 1006 (Pa. Super. 1996) (court will arrest judgment only when criminal information misleads defendant as to charges against him) (internal citation omitted); ***Commonwealth v. Riggle***, 119 A.3d 1058, 1070 (Pa. Super. 2015) (affording Commonwealth "broad latitude" in fixing date of sexual offenses against child victim).

waiver of claims for defects in criminal informations on appeal because neither defendant filed pre-trial motions to quash the informations).

Next, D.S. contends that the evidence presented against him at trial was insufficient to support the jury's conviction of EWOC. *See* Appellant's Brief, at 10. Specifically, he argues that the testimony elicited did not establish that he held a "supervisory role" over the victim within the meaning of the statute. *See id.*

We conclude that D.S. waived his sufficiency claim by failing to identify, with specificity, the challenged elements of the EWOC charge in his Rule 1925(b) statement. In *Commonwealth v. Gibbs*, 981 A.2d 274 (Pa. Super. 2009), we held that "when challenging the sufficiency of the evidence on appeal, the Appellant's 1925 statement must 'specify the element or elements upon which the evidence was insufficient' in order to preserve the issue for appeal." *Id.* at 281 (internal citations omitted). We continued:

> Such specificity is of particular importance in cases where, as here, the Appellant was convicted of multiple crimes[,] each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt. Here, Appellant not only failed to specify which elements he was challenging in his [Rule] 1925[(b)] statement, he also failed to specify which convictions he was challenging.

*Id.* (internal citation omitted).

In the instant case, D.S.'s Rule 1925(b) statement states that "[t]he trial court erred in failing to grant defendant's motion for judgement of acquittal on both offenses for lack of sufficient evidence upon which a verdict

may be based." Appellant's Pa.R.A.P. 1925(b) Concise Statement of Errors Complained on Appeal, 7/23/25 (unnecessary capitalization omitted). It is only in D.S.'s brief to this Court where he narrows his sufficiency claim to address the EWOC charge alone, and the specific basis for that challenge. *See* Appellant's Brief, at 10. Due to D.S.'s lack of specificity in his Rule 1925(b) statement as to which elements the Commonwealth failed to provide sufficient evidence for, his claim that there was insufficient evidence to sustain his EWOC conviction is waived.[9] ***See Gibbs***, ***supra***; ***see also Commonwealth v. Masterson***, 346 A.3d 377, at *3 (Pa. Super. Aug. 26, 2025) (Table) (finding waiver where Appellant's boilerplate assertions in Rule 1925(b) statement failed to specify elements of convictions he wished to challenge).[10] Accordingly, D.S. has waived his challenge to the sufficiency of the evidence, and we afford him no relief on this claim.

---

[9] While the trial court did not find waiver of this issue, it "is 'of no moment to our analysis because we apply Pa.R.A.P. 1925(b) in a predictable, uniform fashion, not in a selective manner dependent on an appellee's argument or a trial court's choice to address an unpreserved claim.'" ***Gibbs***, 981 A.2d at 281. Additionally, although it bears no relevance to this particular analysis, we observe that D.S., in his post-sentence motion, narrowly argued that there was insufficient evidence to conclude he "demonstrated any indication of sexual arousal, nor that his conduct was designed to, or did, cause sexual arousal in the complainant." Appellant's Post-Sentence Motion. These are elements pertaining to the charge of indecent assault of a minor, not EWOC. ***See*** 18 Pa.C.S.A. § 3126(a)(7). D.S. does not challenge the sufficiency of the evidence pertaining to his conviction of indecent assault of a minor on appeal.

[10] ***See*** Pa.R.A.P. 126(a)-(b) (unpublished, non-precedential opinions of this Court filed after May 1, 2019, may be cited for persuasive value).

In his last issue raised on appeal, D.S. challenges the trial court's denial of his motion for a new trial based on his assertion that the jury's verdict was against the weight of the evidence. *See* Appellant's Brief, at 13. D.S. argues that M.V.'s testimony regarding text messages she sent to her boyfriend in 2023, in which she tells him that D.S. "raped" her, show factual inconsistencies in the sequence of events that took place. *See* Appellant's Brief, at 14; N.T Jury Trial, 11/12/24, at 87. Moreover, D.S. points out that M.V. testified she knew the difference in meaning between the words "rape" and "molestation," that she is not sure why she used the word "rape" in the text, and that she falsely told her boyfriend that she was raped multiple times by D.S. *See* N.T. Jury Trial, 11/12/24, at 86-88. Finally, D.S. avers that M.V.'s and J.V.'s testimonies were "substantially different," where M.V. testified that D.S. touched her breasts and vagina while breathing heavily, and J.V. stated that D.S. dragged the victim back and forth across his lap while breathing heavily. *See* Appellant's Brief, at 14; N.T. Jury Trial, 11/12/24, at 78-79, 110-11. The combination of all these factual differences, D.S. contends, should warrant a new trial because they render the jury's guilty verdict "shocking to the conscience." *See* Appellant's Brief, at 14.

Our standard of review of a claim that the verdict was against the weight of the evidence is as follows:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus,

we may only reverse the lower court's verdict if it is so contrary to the evidence as to shock one's sense of justice. Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

*Commonwealth v. Morgan*, 913 A.2d 906, 909 (Pa. Super. 2006) (internal citation omitted). In deciding whether a trial court abused its discretion, we bear in mind that:

[d]iscretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice[,] or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias[,] or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted).

Instantly, the trial court addressed D.S.'s weight claim as follows:

In this case, although there were inconsistencies about her initial disclosure in text messages identified by trial counsel, these do not defeat M.V.'s credibility. Rather, the facts that [M.V.] testified to at trial were the same facts that she revealed to the Mission Kids forensic interviewer. She was consistent that in that car ride she was sitting on [D.S.]'s lap, that he touched her chest and vagina, [and] that he was breathing heavy. Her brother corroborated that M.V. was sitting on [D.S.]'s lap and that he saw [D.S.] touching her. And although he testified that he observed [D.S.] move M.V. back and forth on his lap, while holding her down at the waist, [it] is not inconsistent with M.V.'s testimony, both could be true. J.V.'s vantage point on the [right] hand side of the back seat can explain some of the difference in testimony. Additionally, J.V. testified also to the heavy breathing, which corroborated M.V.'s testimony in this regard. [] Trial counsel cross-examined M.V. about her inconsistencies of her initial disclosure, and he highlighted these facts for the jury. Clearly, the jury credited M.V.'s testimony, even hearing about those

inconsistencies. On the other hand, the jury did not credit [D.S.]'s testimony that he only rubbed M.V.'s back. It was within the province of the jury to make these determinations.

Trial Court Opinion, 9/2/25, at 14-15. Based on a thorough review of the trial record, we conclude that the trial court did not abuse its discretion in finding that the jury verdict was not against the weight of the evidence. While the victim admits that she lied to her boyfriend when she texted him that she was raped multiple times by D.S., this admission was followed by the victim stating she did not know why she said those things to him. *See* N.T. Jury Trial, 11/12/24, at 87. Additionally, whether the victim told the truth to her boyfriend or not goes to her credibility, which was weighed by the jury in light of the rest of the evidence presented at trial, and to which they returned a verdict against D.S. The verdict was not "so contrary to the evidence as to shock one's sense of justice." ***See Morgan***, ***supra***.

Based upon the foregoing, we find D.S.'s claims merit no relief. Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/13/2026